[No. A045068. First Dist., Div. Five. Nov. 13, 1989.]

TERRY L. BARNS, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and
ARCATA REDWOOD COMPANY et al., Respondents.

COUNSEL

Lawrence O. Eitzen and John William Cumming for Petitioner.

Robert D. Prior and Huber & Goodwin for Respondents.

OPINION

HANING, J.—Terry L. Barns was discharged from his employment with Arcata Redwood Company (Arcata) due to a disability caused by on-the-job injuries. He applied to the Workers' Compensation Appeals Board (Board) for benefits under Labor Code section 132a,[1] which prohibits discrimination against industrially injured workers. The workers' compensation judge (WCJ) and Board found that Arcata's conduct did not violate the statute. We issued a writ of review to consider whether this determination is supported by substantial evidence and correct legal principles. We conclude that it is not.

## BACKGROUND

Barns injured the middle finger of his left hand in June 1986, while working as a "green chain puller." The job involved pulling pieces of green (and sometimes very heavy) lumber off a "chain," presumably a conveyor chain. While recovering from this injury, Barns was employed as a "racker"; this was lighter duty, not requiring him to lift anything. When he was medically released for normal duty, he returned to pulling green chain. On September 29, 1986, while so employed, he again injured the middle finger of his left hand, completely snapping the tendon.

Barns's physician, Dr. Emmons, surgically repaired the tendon in October 1986. In November Barns began physical therapy. In December Dr. Emmons wrote a report stating that Barns was "doing quite well" and that "[f]urther improvement is expected." The report contained the statement, "He should get into lighter work eventually, but not pulling greenchain [sic]." In January Dr. Emmons again reported good progress and added,

---

[1] Unless otherwise indicated, all further statutory references are to the Labor Code.

"He may return to light work on February 2, 1987, but to avoid any traumatic injury to the finger and no lifting of over fifty pounds."

Barns learned in March 1987 that a fellow employee was retiring from her position as a racker. He went to Neville Price, an Arcata superintendent and asked if he could have that job until he had healed enough to return to pulling green chain. He invited Price to contact his doctor to confirm that he was medically cleared to perform the job. Price declined, saying that Arcata did not want to take the chance of Barns being reinjured. Price also alluded to a supposed policy precluding an injured employee from seeking a new position until he or she was able to return to the one occupied before the injury.

In March 1987, Dr. Emmons examined Barns and reported, "I estimate he will progress further with improvement, but he will be coming to a rather permanent level of improvement fairly soon. He could drive a truck or do heavy work which did not involve high stresses across the left hand, middle finger. This would be allowed anywhere within the next 4-6 weeks. [¶] The patient is expected to be left with a permanent partial disability, and if injured again would require a DIP joint arthrodesis or tenodesis."

In April 1987, Dr. Emmons again examined Barns and reported, "The patient, in my opinion, should not return to pulling greenchain [sic] as it carries with it an excessive risk of possible rupture of the tendon and subsequent need for future surgery. [¶] He would be left with a permanent partial disability which would restrict him anyway from such activity. [¶] The patient is a candidate for vocational rehabilitation and I heartily encourage him to get into work which would not jeopardize the digit or the tendon repair."

Meanwhile, in February, Arcata's insurance carrier advised Barns by letter of his potential right to rehabilitation benefits. The letter invited Barns to call the carrier. At some point, apparently in April, he phoned the letter's author to inquire about rehabilitation benefits. He was referred to rehabilitation counselor Stephen Diggs, with whom he met on April 21. Barns told Diggs he could do just about any job except pulling green chain. He said that "in general he wanted to stay out of the sawmills because of his hand." He noted, however, that his injury was not yet permanent and stationary.

On May 13, 1987, Arcata's Deborah Callahan sent Barns a letter stating that his employment was terminated effective May 31. The letter gave no explanation as such, but noted that Barns had entered into a vocational rehabilitation program as a result of his industrial injury. Callahan testified that the decision to terminate Barns's employment was based on the risk of

reinjury noted in the April report by Dr. Emmons, and on her discussions with the carrier's representative, who told her Barns "had gone to a rehabilitation counselor and was seeking other forms of employment." Callahan testified that the reason for the termination was "that his doctor had stated that he could not do his normal job duties; that he'd entered into a rehabilitation program; and it was our understanding that he had no intention to come back; that he was being rehabilitated." She also testified that as long as Barns remained an employee on the company's books, Arcata would continue to incur expenses for various fringe benefits including health insurance and the accrual of vacation and holiday time. She stated, however, that these expenses were not the reason for terminating Barns's employment.

Between April and October 1987, Barns tried without success to find another occupation. His medical recovery continued, and in October Dr. Emmons gave him a letter releasing him to work without restrictions and to resume his duties as a green chain puller. The WCJ found that Barns's temporary disability ceased and permanent disability commenced on the date of this letter. Implicit in this finding was the premise that the injury became "permanent and stationary" on that date. (See 1 Herlick, Cal. Workers' Compensation Law (3d ed. 1988) § 7.38, p. 227; *Sweeney* v. *Industrial Acc. Com.* (1951) 107 Cal.App.2d 155, 159 [236 P.2d 651]; *Bstandig* v. *Workers' Comp. Appeals Bd.* (1977) 68 Cal.App.3d 988, 992 [137 Cal.Rptr. 713] ["implicit finding" that petitioner became permanent and stationary on date permanent disability commenced].)

Acting personally and through his attorney, Barns contacted Arcata to seek reinstatement. He was told there were no openings and no prospect of any in the future.

In December 1987, orthopedic consultant Dr. Colloff reported that in his opinion Barns was capable of returning to his occupation as green chain puller. In that same month, Arcata's insurance carrier discontinued rehabilitation benefits on the stated ground that Barns was able to return to his usual occupation.

In January 1988, Barns petitioned the Board for reinstatement, back wages, and increased compensation under section 132a. He charged that Arcata's failure to return him to his job was unlawful discrimination made actionable by the statute. Arcata denied that it had discriminated, and alleged as an affirmative defense that it had terminated Barns's employment based on medical evidence of possible reinjury and on Barns's pursuit of rehabilitation benefits.

In the spring of 1988, Barns learned of two openings for pullers and contacted Arcata to express interest in them. He was told to apply through

the employment development department like any other person seeking employment. He did so. Arcata interviewed him, but hired two other applicants with less mill experience than he had.

The WCJ found that the termination of Barns's employment did not violate section 132a, apparently concluding that Arcata had proven a defense of "business necessities" under *Judson Steel Corp.* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 667 [150 Cal.Rptr. 250, 586 P.2d 564]. He found the termination justified because (1) at the time it occurred Barns was unable to return to his preinjury occupation and seemed likely to be permanently precluded from doing so; (2) Arcata was paying various fringe benefits on Barns's behalf and could not be required to do so "*ad infinitum*"; and (3) Arcata could not be required to reinstate Barns after his employment had been terminated, even though he was medically released and jobs were available, because once the employment relationship was severed Arcata was "no longer subject to the duty imposed on employers by Labor Code Section 132a."

The Board denied Barns's petition for reconsideration.

ANALYSIS

A. *Standard of Review.*

■ The ultimate question before this court is "whether, under applicable principles of law, the award is supported by substantial evidence. [Citations.] As Labor Code section 5953 provides, 'The findings and conclusions of the appeals board on questions of fact are conclusive and final and are not subject to review. Such questions of fact shall include ultimate facts and the findings and conclusions of the appeals board.' Thus if the board's findings ' "are supported by inferences which may fairly be drawn from evidence even though the evidence is susceptible of opposing inferences, the reviewing court will not disturb the award." ' [Citation.]" (*Judson Steel Corp.* v. *Workers' Comp. Appeals Bd., supra,* 22 Cal.3d at p. 664.) However, the WCJ and Board "must accept as true the intended meaning of [evidence] both uncontradicted and unimpeached." (*McAllister* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 408, 413 [71 Cal.Rptr. 697, 445 P.2d 313], quoted in *LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 639 [83 Cal.Rptr. 208, 463 P.2d 432].) Furthermore, the court is not bound by the Board's conclusions on questions of law. (*Western Electric Co.* v. *Workers' Comp. Appeals Bd.* (1979) 99 Cal.App.3d 629, 644 [160 Cal.Rptr. 436].) Where the award rests on an erroneous interpretation of law it will be annulled. (See *Smith* v. *Workers' Comp. Appeals Bd.* (1984) 152 Cal.App.3d 1104, 1106 [199 Cal.Rptr. 881].) ■ It is for the court to decide whether

the facts found by the Board constitute a violation of section 132a. (*Western Electric Co.* v. *Workers' Comp. Appeals Bd., supra,* 99 Cal.App.3d at p. 644.)

B. *Section 132a and the Business Realities Defense.*

In *Judson Steel Corp.* v. *Workers' Comp. Appeals Bd., supra,* 22 Cal.3d at page 667, the court held that section 132a affords relief to any employee who suffers discrimination as a result of an industrial injury, even if the discriminatory conduct is not of the type specifically identified in the statute. The court added, however, that the statute "does not compel an employer to ignore the realities of doing business by 'reemploying' unqualified employees or employees for whom positions are no longer available." (*Ibid.,* fn. omitted.)

This court elaborated on the principles of *Judson Steel* in *Smith* v. *Workers' Comp. Appeals Bd., supra,* 152 Cal.App.3d 1104, 1109. We held there that the Board had erroneously applied section 132a in upholding the discharge of an employee for a supposed violation of company policy. We held that a worker proves a violation of section 132a by showing that as the result of an industrial injury, the employer engaged in conduct detrimental to the worker. If the worker makes this showing, the burden shifts to the employer to show that its conduct was necessitated by the realities of doing business. (*Ibid.*) We emphasized that the employer must demonstrate that its action was "*necessary*" and "directly linked to business *realities.*" (*Ibid.,* italics in original.)

██ On the uncontroverted evidence, Barns has presented a prima facie case under section 132a. It is undisputed that his industrial injury was a direct cause of his loss of employment. As Arcata says in its answer to the petition for review, "The decision to terminate petitioner was based in substantial part on medical evidence he could not return to his former job without an excessive risk of re-injury requiring further surgery and that, in any event, he had a permanent disability which would preclude such work." This statement amounts to a concession that a causal link exists between Barns's injury and his discharge, so as to warrant a finding of discrimination under *Judson Steel* and *Smith.* The question, then, is whether Arcata carried its burden of proving that its action was necessitated by the realities of doing business.

C. *Failure to Restore to Light Duty.*

One of the instances of discrimination charged by Barns was Arcata's refusal to place him on light duty pending the resolution of his injuries. This

was an integral part of the chain of events leading to his permanent loss of employment with Arcata. Arcata has made no attempt to demonstrate that this conduct was necessitated by business realities. Barns testified that an Arcata supervisor cited a supposed policy which forbade assigning an injured employee to light duty who had not been medically cleared to resume his or her original position. However, Arcata has made no attempt to show that the adoption or application of such a policy was necessitated by the realities of doing business.

The apparent absence of business necessity in connection with this supposed policy is indicated by Barns's uncontroverted showing that the policy, if it existed, was inconsistently applied. Barns himself had been placed on light duty after his earlier injury. One coworker testified that he knew of injured workers who were permitted to return to light duty, and only knew of two (Barns being one) who were not permitted to return. Another worker testified that he saw two company memoranda concerning light duty assignments. The first was dated in February 1987, the month in which Barns was medically cleared to return to light duty. It said there was no longer any light duty and that an injured employee who could not return to his or her original job would be discharged. The second was dated in June 1987, the month after Arcata terminated Barns's employment. It said that light duty status had been restored and that workers who could not perform their original job would be put on light duty until they could return to their job.

It is difficult to conceive how a policy can be deemed "necessary" if it only existed for four or five months and was only applied to two employees. Even a consistently applied policy or practice may be found to violate section 132a. (See *County of Santa Barbara* v. *Workers' Comp. Appeals Bd.* (1980) 109 Cal.App.3d 211, 215, fn. 2 [167 Cal.Rptr. 65].) A policy which has been only whimsically applied cannot support a finding of business necessity for discriminating against an industrially injured worker.

The only other suggested explanation for Arcata's failure to restore Barns to light duty when he requested it in February 1987 is Price's statement, as reported by Barns, that "they didn't want to take the chance of my finger being reinjured . . . ." This supposed concern, however, was completely unsupported by medical evidence. Arcata made no effort to determine whether it was well founded, and Price apparently ignored Barns's request that he contact Barns's doctor. A fear of reinjury based on a supervisor's hunch is not a business reality necessitating a refusal to reemploy. The record fails to disclose any justification for Arcata's refusal to restore Barns to a light duty position.

D. *Termination of Employment Relationship.*

If Arcata failed to show a business necessity warranting a refusal to return Barns to light duty, it obviously failed to show that it was necessary to completely sever the employment relationship. Furthermore, even if light duty had been unavailable for some reason, none of the asserted justifications formed a reasonable basis for believing in May 1987 that it was necessary to terminate his employment, only eight months after the injury occurred, at a time when Barns was still showing improvement and his injury had not been declared permanent and stable.

Four possible justifications for the discharge are suggested: (1) The opinion of Dr. Emmons in his April report that Barns "should not return to pulling green chain as it carries with it an excessive risk of possible re-rupture of the tendon and subsequent need for future surgery"; (2) Barns's entry into rehabilitation counseling; (3) Barns's reported interest in starting a new career; and (4) Arcata's supposed obligation to pay for certain fringe benefits on Barns's behalf so long as he retained employee status. These facts are insufficient, singly or in combination, to show business necessity.

1. *Medical Evidence.*

The WCJ reasoned as follows: "All medical evidence at the time of applicant's termination was that he was unable to return to his preinjury occupation and was likely to be permanently precluded from returning to his position at the time of the injury. Such action has been held *not* to constitute a violation of Labor Code Section 132a." (Italics in original.) The WCJ cited six cases in which the Board found termination of employment warranted because a disability made it appear that the employee could not resume employment. (*Kottke* v. *International Rectifier* (1980) 8 Cal. Workers' Comp. Rptr. 105, writ den. 45 Cal.Comp.Cases 633; *Webster* v. *Workers' Comp. Appeals Bd.* (1982) 47 Cal.Comp.Cases 660; *Kirkman* v. *Workers' Comp. Appeals Bd.* (1983) 48 Cal.Comp.Cases 805; *Kuberek* v. *Workers' Comp. Appeals Bd.* (1986) 51 Cal.Comp.Cases 46; *Mays* v. *Workers' Comp. Appeals Bd.* (1986) 51 Cal.Comp.Cases 221; *Plumb* v. *Workers' Comp. Appeals Bd.* (1987) 52 Cal.Comp.Cases 446.)[2]

However, neither these cases nor any other authorities known to us warrant the complete termination of employment based on a mere likelihood of permanent disability, where the worker's injuries are not yet permanent and stable. Two of the cited cases seem entirely inapposite. In one a

---

[2] Four of the WCJ's citations are erroneous, but he apparently intended to refer to the cases cited here.

worker was discharged after she refused to undergo surgery which was recommended by two physicians and without which she could not perform her duties. (*Plumb* v. *Workers' Comp. Appeals Bd., supra,* 52 Cal.Comp.Cases at p. 447.) In the other the employer did not discharge the worker, but refused to reinstate him without a medical clearance. (*Mays* v. *Workers' Comp. Appeals Bd., supra,* 51 Cal.Comp.Cases 221.)

In the four remaining cases, the employment was terminated after an award had been made on a finding of permanent disability. (*Kuberek* v. *Workers' Comp. Appeals Bd., supra,* 51 Cal.Comp.Cases at p. 46; *Kirkman* v. *Workers' Comp. Appeals Bd., supra,* 48 Cal.Comp.Cases at p. 805; *Kottke* v. *Workers' Comp. Appeals Bd., supra,* 8 Cal. Workers' Comp. Rptr. at p. 105; *Webster* v. *Workers' Comp. Appeals Bd., supra,* 47 Cal.Comp.Cases at p. 661 [finding by State Personnel Board of inability to perform job].) Impliedly, at least, the injuries in these cases were "permanent and stationary." (See *Bstandig* v. *Workers' Comp. Appeals Bd., supra,* 68 Cal.App.3d 988, 992.) Here, in contrast, there had been no determination of the existence or extent of permanent disability. The report by Dr. Emmons on which Arcata relied was obviously preliminary, and while it discussed the likely future cause of the injury it indicated that Barns's condition was continuing to improve. At most it established a *likelihood* that Barns would be unable to resume his job as puller. It did not establish that he was permanently unable to perform that job.

Three interrelated principles emerge from Board decisions concerning the right to discharge, or the duty to reinstate, disabled workers. ■ First, an employer's *refusal to reinstate* an injured worker to an available position may be justified as a business necessity if it appears that, *at the time reinstatement is sought,* the employer reasonably believes the worker is unable to perform the duties of the position without undue risk of reinjury. (See *Northrop Corp.* v. *Workers' Comp. Appeals Bd.* (1987) 52 Cal.Comp.Cases 445 [violation found]; *Universal Foods Corp.* v. *Workers' Comp. Appeals Bd.* (1985) 50 Cal.Comp.Cases 291 [violation found where refusal to rehire was unreasonable under circumstances; consensus medical opinion was worker could perform job without risk of reinjury]; *Pleasant Valley School District* v. *Workers' Comp. Appeals Bd.* (1985) 50 Cal.Comp.Cases 396 [violation found where, inter alia, employer did not explain why it failed to request more specific information from worker's physician concerning ability to perform]; *McClintic* v. *Workers' Comp. Appeals Bd.* (1987) 52 Cal.Comp.Cases 444 [no violation]; *Caputo* v. *Workers' Comp. Appeals Bd.* (1986) 52 Cal.Comp.Cases 4 [no violation]; *Mays* v. *Workers' Comp. Appeals Bd., supra,* 51 Cal.Comp.Cases 221 [no violation]; *Silva* v. *Workers' Comp. Appeals Bd.* (1985) 50 Cal.Comp.Cases 393 [no violation where employer's physician restricted worker from necessary lifting]; *Faddis* v. *Workers' Comp. Appeals Bd.* (1985) 50 Cal.Comp.Cases 386 [no violation

where excessive absences and worker unable to furnish medical clearance]; see *Smith* v. *Workers' Comp. Appeals Bd.* (1987) 52 Cal.Comp.Cases 63 [placement on medical leave not a violation]; *Chavez* v. *Workers' Comp. Appeals Bd.* (1986) 51 Cal.Comp.Cases 422 [same]; *Argiro* v. *Workers' Comp. Appeals Bd.* (1985) 50 Cal.Comp.Cases 646 [same, placement on leave without pay pending presentation of medical certification of ability to work]; *Castro* v. *Workers' Comp. Appeals Bd.* (1985) 50 Cal.Comp.Cases 590 [transfer to lower-paying job justified by good faith belief based on medical opinions].)

Second, business realities may compel the employer to replace the worker, and in such instances the employer does not violate section 132a if the unavailability of the position precludes reinstatement. (See *McClintic* v. *Workers' Comp. Appeals Bd., supra,* 52 Cal.Comp.Cases 444.)

Third, and most significant here, business realities do not necessitate the *termination* of employment unless the employer *reasonably* believes that the worker is *permanently* disabled from performing the job, or will be disabled for such a long time that termination is necessary in light of demonstrated business realities. (See *Duckson* v. *Workers' Comp. Appeals Bd.* (1984) 49 Cal.Comp.Cases 11, 13 [test for determining whether change in work status violates section 132a is whether employer had "reasonable basis" for action]; *Martin Marietta Aluminum Co.* v. *Workers' Comp. Appeals Bd.* (1985) 50 Cal.Comp.Cases 243 [violation found where inability to perform not shown and injury not permanent and stationary at time of termination]; *Earle M. Jorgensen Co.* v. *Workers' Comp. Appeals Bd.* (1984) 49 Cal.Comp.Cases 150 [violation found where no medical evidence supported employer's fear worker would "become a cripple" if continued in job]; *Dutil* v. *Workers' Comp. Appeals Bd.* (1988) 53 Cal.Comp.Cases 136 [no violation where policy called for termination after two years' absence and to perform any other job would require at least one year's retraining]; *Plumb* v. *Workers' Comp. Appeals Bd., supra,* 52 Cal.Comp.Cases 446 [no violation]; *Morin* v. *Workers' Comp. Appeals Bd.* (1985) 50 Cal.Comp.Cases 22 [no violation where two doctors agreed on restrictions which precluded assignment to available jobs]; *Brown* v. *Workers' Comp. Appeals Bd.* (1984) 49 Cal.Comp.Cases 694 [no violation]; *Kirkman* v. *Workers' Comp. Appeals Bd., supra,* 48 Cal.Comp.Cases 805 [no violation]; *Kuberek* v. *Workers' Comp. Appeals Bd., supra,* 51 Cal.Comp.Cases 46 [no violation]; *Kottke* v. *International Rectifier, supra,* 8 Cal. Workers' Comp. Rptr. 105 [no violation]; see *Robinson* v. *Workers' Comp. Appeals Bd.* (1986) 51 Cal.Comp.Cases 559 [discharge where unable to meet quota, not a violation].)

Here, the employer permanently severed the employment relationship some five months before the injury was permanent and stable. Without

a showing by the employer of some compelling business necessity, such precipitous action must be deemed unwarranted. In order to *reasonably* believe that a worker is permanently barred from resuming employment, the employer must have some evidence that the injury itself is sufficiently permanent and stable to permit a prognosis with reasonable medical certainty. A physician's opinion that the injury is likely to preclude the resumption of preinjury duties cannot carry or supply such certainty when it is evident that the patient is continuing to improve and the injury has not stabilized. An employer cannot simply pounce upon a preliminary opinion as evidence of business necessity and, without further investigation, sever the employment relationship. Where no more than this is shown, a finding of business necessity lacks substantial evidentiary support and rests on a misconstruction of the applicable law.

2. *Rehabilitation Benefits.*

In a letter to the employment development department, Arcata's Callahan wrote that Barns was terminated because he "was a qualified injured worker well within a rehabilitation program in our worker's compensation system." We reject the suggestion that an injured worker's acceptance of rehabilitation services warrants the termination of employment.

A "qualified injured worker" (QIW) is one entitled to rehabilitation benefits. (§ 139.5, subd. (c); Cal. Code Regs., tit. 8, § 10009, subd. (f).) To be a QIW, the worker must be both medically and vocationally eligible. (Cal. Code Regs., tit. § 10003, subd. (c).) The worker is medically eligible if the effects of the injury "permanently preclude, or are likely to preclude the employee from engaging in his or her usual and customary occupation or the position in which he or she was engaged at the time of injury . . . ." (Cal. Code Regs., tit. 8, § 10003, subd. (c)(1).)

Arcata apparently reasoned that (1) Barns was a QIW because he participated in rehabilitation services; therefore (2) he was medically eligible, i.e., likely to be precluded from returning to his employment; and (3) this was a business reality necessitating the termination of his employment.

This reasoning is badly flawed. First, Barns's mere acceptance of proffered rehabilitation services did not establish that he was in fact a QIW. Without some adjudication of his status, the mere acceptance of benefits could effect the forfeiture of employment rights only through some doctrine such as waiver or estoppel. No attempt was made to establish the applicability of any such doctrine here.

Furthermore, a finding of QIW status would not necessarily mean that Barns was in fact permanently disabled. He could be eligible for rehabilita-

tion on a finding that he was "likely" to be precluded from returning to his position. (Cal. Code Regs., tit. 8, § 10003, subd. (c)(1).) The degree of likelihood which warrants commencement of rehabilitation services is not necessarily identical to the degree of certainty which may constitute a business reality necessitating the severance of employment.

To hold that Barns's participation in rehabilitation services warranted a forfeiture of employment rights would subvert the fundamental policy of section 132a by authorizing discrimination against employees based solely on the exercise of statutory rights under the workers' compensation laws. ■ It would also subvert a primary policy of section 139.5, i.e., to encourage the early commencement of rehabilitation services. (See *Industrial Indemnity Co.* v. *Workers' Comp. Appeals Bd.* (1985) 165 Cal.App.3d 633, 638-640 [211 Cal.Rptr. 683].) In many cases a worker's medical eligibility may be unsettled for some time. If the employer offers services during this period and the worker accepts them, the policy of the law is served whether or not the worker ultimately proves to be permanently unable to resume his employment. On the other hand, if the employer may rely on the acceptance of benefits as a basis for terminating the employment relationship, workers will be forced to predict at their peril the degree of their ultimate recovery. Such a policy would deter them from accepting services and would thwart the basic policy of the law. ■ Accordingly, the worker's acceptance of rehabilitation services cannot, by itself, constitute a "business reality" necessitating the termination of employment.

■ Again we emphasize that the "business realities" defense rests on a showing of *necessity.* There was no attempt by Arcata to show that the acceptance of rehabilitation benefits required or compelled it to discharge Barns. Instead of addressing the realities of doing business, it relied on highly formalistic (and ultimately flawed) reasoning to justify discrimination against a disabled worker.

3. *"Voluntary" Termination.*

In explaining her decision to terminate Barns's employment, Callahan noted her understanding that Barns was "talking about other lines of work" with the vocational rehabilitation counselor. She apparently inferred on this basis that Barns "had no intention to come back." Thus, although she made no attempt to confirm his supposed lack of interest in returning to work at Arcata, his termination was described as "voluntary" on the pertinent form.

To the extent Callahan believed that termination was warranted by a mere expression of interest in other careers, the belief was unreasonable and its effectuation would violate public policy for the reasons discussed in

connection with rehabilitation services. An injured worker whose ability to resume a previous occupation is in doubt may certainly be permitted (and ought to be encouraged) to prepare for the possibility that a new occupation must be found. In the present case the inference drawn by Arcata—that the worker had no interest in returning to the previous occupation—was particularly pernicious, since Barns had in fact sought reemployment with Arcata (on light duty) but had been turned away on grounds we have already held insufficient. There was simply no reasonable basis to believe that Barns "voluntarily" terminated the employment relationship or consented to its termination.

### 4. *Fringe Benefits.*

Nor can the termination of Barns's employment be justified on the grounds that Arcata was entitled to terminate the expenses it was incurring in fringe benefits on Barns's behalf. There was no attempt to show that the cessation of these expenses was necessitated by business realities. Indeed Arcata's witness Callahan testified that this was not the reason for terminating Barns's employment. The WCJ noted that an employer could not be expected to incur such costs "ad infinitum," but there was no evidence that Arcata was exposed to any such open-ended obligation. The facts showed only a preliminary opinion by a physician. The question is whether it was necessary to terminate this expense before a final evaluation could be made. There is no evidence that it was.

Arcata also failed to prove any necessary connection between ending Barns's fringe benefits and terminating his employment—bearing in mind that the significance of the latter, as understood by Arcata, was that Barns lost any right to reinstatement or to a preference in hiring. It might be inferred from Callahan's testimony that there was a general practice of paying fringe benefits so long as a disabled worker remained on the company's books as an employee, but there was no attempt to show that this practice arose from or gave rise to a business necessity. In other words, even if business realities necessitated the cessation of fringe benefits it does not follow that it was necessary to completely obliterate Barns's employment rights.

To the extent the Board's decision rests on a factual finding that business realities necessitated the termination of Barns's employment, the finding is not supported by substantial evidence. To the extent the decision rests on a conclusion of law that the circumstances presented amounted to "business necessity," the conclusion is erroneous. On this record the termination of Barns's employment appears wholly without justification and therefore

constitutes discrimination against an injured worker in violation of section 132a.

E. *Failure to Rehire.*

██ Arcata not only refused to reinstate Barns to light duty but also failed to rehire him when two puller positions became available in April 1988. The WCJ reasoned that this did not violate section 132a because there was no employment relationship at the time and Arcata therefore had no obligation to refrain from discrimination based upon Barns's industrial injury. In support of this conclusion the WCJ cited *City of Anaheim* v. *Worker's Comp. Appeals Bd.* (1981) 124 Cal.App.3d 609 [177 Cal.Rptr. 441]. The worker in that case resigned his employment with the petitioner and went to work for another employer. The court annulled an award based on the first employer's conduct in advising the second employer to discharge the worker. The court held that the employer could not be liable under section 132a because the statute contemplates an employment relationship at the time of the discriminatory act.

The critical distinction between *City of Anaheim* and the present case is that the employment relationship there had been unequivocally and lawfully terminated before any of the allegedly discriminatory acts took place. Here the purported termination was itself discriminatory. It cannot provide a basis for immunizing the employer's later discriminatory conduct. The "business realities" of this situation were that Arcata attempted to bootstrap its way to a justification for actions which were plainly discriminatory and for which no concrete necessity was demonstrated.

The award under review is annulled.

Low, P. J., and King, J., concurred.